CARPENTER v. KARNOW et al.

(District Court, D. Massachusetts. December 26, 1911.)

No. 333.

1. BANKRUPTCY (§ 179*)—"SALE IN BULK."

Where personal property, part of a bankrupt's stock, was sold to defendant at three different times shortly before bankruptcy, the goods being less than the bankrupt's entire stock in trade, the sale was not a "sale in bulk" within Laws Mass. 1903, c. 415, regulating sales in bulk.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 179.*]

2. BANKRUPTCY (§ 303*)—PERSONAL PROPERTY—FRAUDULENT TRANSFER.

Evidence *held* to require a finding that a sale of a large part of the bankrupt's stock in trade to defendant shortly before bankruptcy intervened, and not made in the usual course of business, was not for full value as claimed, but was made with a fraudulent intent to hinder, delay, and defraud the bankrupt's creditors in which defendant participated.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

In Equity. Bill by Edward N. Carpenter, as Trustee in Bankruptcy of S. Williams & Brother, against Naaman Karnow and others, to recover certain personal property alleged to have been transferred by the bankrupt in fraud of creditors. Decree for complainant.

Leon R. Eyges and Eyges, Wyner & Freedman, for complainant.
Jacobs & Jacobs, for respondent.

DODGE, District Judge. This bill in equity is brought by the trustee in bankruptcy of the firm of S. Williams & Bro., who were adjudged bankrupt in this court May 31, 1910, under a creditors' petition filed May 9, 1910. It alleges that the bankrupt made certain transfers of property to the defendants on or about April 27 and April 29, 1910, with intent to hinder, delay, and defraud their creditors. It asks that the defendants be ordered to deliver the property so conveyed to the trustee, or to account for and turn over to him all sales made by them of said property and all profits realized therefrom. It also asks for an injunction, which has been issued, restraining the defendants from disposing of the property until further orders by the court.

The bankrupt firm was composed of Samuel Williams, Henry Williams, and Louis Kramer. They did business at 77 Bedford street, Boston. Their bankruptcy schedules, filed June 20, 1910, in this court, describes them as engaged in the business of wholesale dry goods and novelties. Schedule A sets forth firm liabilities to the amount in all of $13,690.21 and firm assets to the amount of $2,-259.98. No individual liabilities are scheduled, and the amount of individual assets is inconsiderable. Of the firm assets the principal item scheduled is "stock in trade in business of wholesale men's furnishings at 77 Bedford street of the value of $1,335." The other items are: Debts due on open account, $845; fixtures, $75; cash on hand, $4.40.

The defendants Naaman and Abraham I. Karnow do not dispute that there were transfers of merchandise from the bankrupts' stock in trade to them between April 27, 1910, and the filing of the creditors' petition against the bankrupts on May 9, 1910. But they allege and contend that the merchandise so transferred was bought by them from the bankrupts in good faith, in the ordinary course of trade, for a present fair consideration, without knowledge or reason to know on their part that the bankrupts were insolvent, or were contemplating bankruptcy, or were intending any fraud upon their creditors; also, that the merchandise so bought was paid for in full, in part by cash and in part by checks and notes since paid by them.

Upon the evidence before me at the hearing I find the following facts:

1. The defendants at the time Williams' firm went into bankruptcy as above, and for some years before, carried on business at 76 Chauncy street, Boston. They dealt as jobbers in gloves, hosiery, men's furnishings, and dry goods. Chauncy and Bedford streets intersect, and the defendants' place of business was not far from that of the bankrupts, around the corner. There had been occasional purchases of goods by the defendants from the bankrupts before the transactions here in question. These, however, had been of comparatively small amount. In the year 1909 they aggregated about $200. Samuel Williams and Naaman Karnow had been acquaintances for several years and were on visiting terms.

2. There was a fire in the bankrupts' place of business in February, 1910, which, as they claim, destroyed a considerable quantity of their goods. It interrupted their business, which was not resumed until about April 1, 1910. There was an arbitration to settle the amount of the fire loss due from their insurers. They sold after the fire a considerable quantity of their remaining goods to the Raymond Syndicate. Of these facts the defendants had knowledge. They knew also that the bankrupts not infrequently "swopped checks" with other concerns. On several different occasions within a month prior to the transactions here in question they had themselves swopped checks with the bankrupt firm for its accommodation.

3. On May 4, 1910, in a suit brought in the state courts against the bankrupts, the stock in trade in their store was attached and a keeper put in charge of it. On May 5th the sheriff removed and stored a part of the goods to hold them under the attachment. On Saturday, May 7th, the bankrupts executed a general assignment of all their property for the benefit of their creditors; the property being therein described as "all stock in trade and fixtures located at 77 Bedford street in the city of Boston." This assignment was drawn by and made under the advice of the same attorneys who represent the defendants in this suit. Also on Saturday, May 7th, the same attorneys had another member of the bar prepare a creditors' petition against the bankrupts whereon they were adjudged bankrupt May 31, 1910, as has been stated, and had the petitioning creditors swear to it before him. They gave him the names of the first two petitioning creditors, told him how to find the third, and instructed him re-

garding the allegations charging acts of bankruptcy to be made in the petition. His name alone appeared on the petition as representing the creditors, and he filed the petition in court. As drawn on May 7th, the only act of bankruptcy charged was a transfer on or about April 1st of property not specified, to creditors not named, with intent to prefer them. This being regarded as unsatisfactory at the clerk's office, a further allegation charging the general assignment made May 7th as an act of bankruptcy was inserted before the petition was filed on the morning of Monday, May 9th.

4. At the time of the transfers of merchandise from the bankrupts to the defendants which are here in question, the bankrupts were heavily insolvent and knew themselves to be so insolvent.

5. The transfers in question were made during the week preceding the attachment of their stock in trade on May 4th. It is not disputed that they included the following:

         153 dozen shirts,
       1,894   "   handkerchiefs,
       1,483 pieces of ribbon,
          40 dozen men's shirts and drawers,
          97   "   ladies vests and pants,
         160   "   hose,
         179   "  . men's hose,
          54   "   ladies' hose,
          59   "   boys' trunks,
           1 case of combs,

and several smaller quantities of articles similar in character.

6. Samuel Williams, on behalf of the bankrupts, and Naaman Karnow, on behalf of the defendants, testified that the defendants, represented by Karnow, bought of the bankrupts all the goods in question, not all at once, but at various times on April 27, April 29, and May 3, 1910. Five bills were produced, purporting to cover all the goods thus transferred and to set forth the prices at which the various articles had been sold. These bills, according to the witnesses above named, had been successively rendered for separate purchases, successively agreed on by the parties. The first two bills, both dated April 27, 1910, were for shirts—one bill for 1 dozen at $3.10, the other for 152 dozen at $3.50, amounting to $532. The next bill, dated April 29, 1910, was for 1,010 dozen handkerchiefs, in all, at various prices, amounting to $226.15; and 160 dozen hose at prices amounting to $82. The two remaining bills bore date May 3, 1910. One was for 637 pieces of ribbon, in all, at various prices amounting to $270.08. The other included all the remaining articles transferred. The prices specified in it amounted in all to $1,004.99. In it were included 346 other pieces of ribbon at prices aggregating $34.60; 884 dozen other handkerchiefs at prices aggregating $117.82. Some of the other quantities and prices specified in it were: 40 dozen men's shirts and drawers, $110; 97 dozen ladies' vests and pants, $184.30; 179 dozen men's hose (3 lots), $136.35; 1 case of combs, $87.07.

7. The total amount of all five bills was $2,118.32. Each was on a printed bill head of the bankrupt firm. Each bore the words "Rec. Paid S. W. & Bros.," being the bankrupts' receipt according to the testimony. My finding in paragraph 5 above as to the quantities of the various goods transferred is based on the bills referred to, and the fact that in this respect the testimony relating to them was not disputed. The bills are exhibits in the case and may be referred to in connection herewith.

8. The goods thus transferred did not constitute the bankrupts' entire stock in trade. Other goods were in their store at the time of the attachment on May 4th, above referred to. They did constitute, however, the greater portion of the bankrupts' stock in trade in the store April 24th to May 3d both in quantity and in value.

9. The goods transferred were for the most part goods of a kind in which the defendants had not been accustomed to deal and of a kind which they had not been accustomed to buy from the bankrupts. The total amount was far larger than that of any previous purchase made by them from the bankrupts. Except the bill for 1 dozen shirts dated May 27th, each bill was larger in amount than the amount of any single purchase shown to have been previously made by the defendants from the bankrupts.

10. All the goods referred to were delivered to the defendants before the attachment on May 4th, some of them being sent in the original cases or packages wherein they had come to the bankrupts.

[1] 11. If, as the plaintiff contends, this was a "sale in bulk," the requirements of the Mass. Statute, Acts 1903, c. 415, were not observed, and the sale is void for that reason. In my opinion the evidence does not warrant the finding that it was a "sale in bulk" within the meaning of the statute referred to, even if it be assumed that there was one agreement for the transfer of all the goods. I find no case in which the sale of less than an entire stock in trade has been so regarded.

[2] 12. The transfer was, however, outside the usual course of the bankrupts' business, the defendants knew it to be so, and this knowledge, together with their knowledge above referred to regarding the bankrupts' recent experiences and doings, was sufficient to charge them with such knowledge of the bankrupts' financial condition as inquiry made with the diligence which reasonable prudence required under the circumstances would have given them. According to their own account, they made no such inquiry. Not having made it, their testimony that they believed the bankrupts solvent cannot avail them. The transaction was thus one which must be held fraudulent as to creditors unless its good faith is established by evidence sufficiently strong to overcome the contrary presumption.

13. Proof that the defendants paid full value for the goods at the time, as they claim to have done, might be sufficient for the purpose. A receipt produced in evidence was said by the witnesses above mentioned to have been given at the time. It is dated May 4, 1911, and purports to be for $2,118.32 "in notes, cash and checks, in full payment to date." The testimony of the same witnesses was

that four notes of the bankrupt firm, all dated May 4th, each for $200 payable to the bankrupts' order in one, two, three, and four months, respectively, were given in payment, and that four checks of the bankrupt firm were also given, three dated April 27th, for $300, $200, and $125, respectively; also one dated April 29th, for $150. Notes and checks amounted to $1,575. $543 more was paid in cash, according to the same testimony, making $2,118 in all. If the purchases were really made separately and successive bills rendered for each, it seems clear, since the notes, checks, and cash, said to have been taken in payment as above, in no way correspond with the separate amounts of the bills, that there must have been only one settlement upon all five bills, and that made after the last purchase. Notes and checks claimed to be those taken in payment were produced at the hearing, but to show that $543, in addition to their total amount, was really paid in cash, there is only the testimony of the two witnesses above mentioned, with little to confirm that testimony in the other circumstances which appear. Books were produced, said to be the books kept by the respective concerns. On the bankrupts' journal, page 456, the two bills dated April 27th appear separately, among sales to other persons of that date, as sales to the defendants. On page 457 appears the bill dated April 29th for $308.-15. Following page 458, whereon all the transactions entered appear as of April 29th, four pages are missing from the book, and there is evidence that the defendants ordered them torn out. Page 463 follows page 458 as the book stands, showing transactions of April 29th, 30th, May 2d, and 3d. Page 464 is the last page having dated entries, all the entries on it are under May 3d, and the two bills of $1,004.99 and $270.08 are the last dated entries in the book. There is evidence that they were written into the book under the defendants' orders, not on May 3d but on some other date not identified. On the bankrupts' ledger, page 59, the total amounts of the five bills appear as the last five items on each side of the account; each being balanced by an opposite entry on the same line by the same amount entered as "cash." Turning to the defendants' books, their cashbook has an entry under May 4, 1910, of $2,118.32 as paid the bankrupts. On their ledger account with the bankrupts (page 66) no items later in date than April 14th appear. There are no entries on the books of either concern which afford in themselves any support to the claim that the notes, checks, and cash testified to were given or received in due course of business in payment for these goods.

14. Of the absence from the bankrupts' journal of the four missing pages referred to, there was no satisfactory explanation; indeed, there was hardly any attempt to explain it. As the entries which would be expected to appear on those pages would be the records of their doings on April 29th–May 3d, the days during which the greater part of the goods are claimed to have been sold, including the last day on which they did any business, there is strong reason to believe that there has been intentional concealment or alteration of the records originally made for that day, or else that, as it stands,

the entire record is fictitious. This, with the further fact that the books fail to support the account given of the particular manner in which payment for the goods is claimed to have been made, prevents me from accepting the testimony of the witnesses referred to as sufficient proof, under the circumstances, that a present fair consideration was really paid by the defendants for the goods. Upon the unsupported testimony of these witnesses, having heard them testify in person, I am unable to place sufficient reliance for the purpose. They did not impress me as entirely truthful. Their resort to failure of recollection when inconvenient questions were put was so frequent, and the instances of statements elsewhere made by them inconsistent with their statements before me were so numerous, as to confirm this opinion of their reliability. I find myself unable to believe that the defendants really paid the bankrupts $543 in cash, as claimed. If not, the defendants got the goods for considerably less than their value, even if they really gave the notes and checks testified to, and paid these in due course.

15. As found in paragraph 3, the bankrupts voluntarily committed an act of bankruptcy on May 7th, and the involuntary petition filed against them on May 9th, though nominally an involuntary petition founded on that act of bankruptcy, must be regarded as brought on their behalf. The circumstances afford no little reason to believe that the defendants must have known that the bankrupts were preparing for and taking this course. It appeared that after the bankruptcy the wife of one bankrupt continued the same business, at the same place, as the "Williams Dry Goods Company," though this was only a name; there being in fact no such corporation. It further appeared that the defendants began at once to sell the goods here in question to her, in comparatively small quantities at a time, that these sales were under agreement with her that they should share the profits with her, and that such sales continued under this agreement until the injunction in this suit was issued. Some, at least, of the sales thus made were before the maturity of the defendants' notes said to have been given the bankrupts in payment for this property.

My decision, in view of all the facts found as above, must be that the property in question was transferred with the intent and purpose on the bankrupts' part to hinder, delay, and defraud their creditors; that the defendants are not only chargeable with knowledge of the bankrupts' insolvent condition, but had actual knowledge of the bankrupts' fraudulent intent and participated in it; that the defendants cannot be regarded as purchasers in good faith and for a present fair consideration; and that the transfer to them is null and void as against the trustee in bankruptcy, who seeks to avoid it by this suit. A decree giving him the relief sought by his bill may be accordingly entered.